UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **UNITED STATES OF AMERICA**  )<br>  )<br>v.  )<br>  )<br>  )<br>**ENDO HEALTH SOLUTIONS INC.**  )<br>  ) | Case: 2:24-cr-20159<br>Judge: Parker, Linda V.<br>MJ: Patti, Anthony P.<br>Filed: 03-27-2024<br><br>**Violations:**<br>21 U.S.C. §§ 331(a), 333(a)(1) 352(f)(1) |

## INFORMATION

The United States charges that:

### DEFENDANT

1. Defendant ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO HEALTH SOLUTIONS INC. is a subsidiary of Endo International plc.

2. At all times relevant to this Information, defendant ENDO HEALTH SOLUTIONS INC. (hereinafter "ENDO"), was either a direct or indirect parent company of ENDO PHARMACEUTICALS INC., which was a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

3. At all times relevant to this Information, ENDO conducted business in the Eastern District of Michigan and elsewhere.

4. At all times relevant to this Information, ENDO was engaged in the pharmaceutical business throughout the United States, including in the Eastern District of Michigan. ENDO's business included the marketing, promotion, and sales of extended-release prescription opioid drugs containing oxymorphone under the brand names Opana ER and reformulated Opana ER with INTAC (hereinafter "reformulated Opana ER").

## LEGAL BACKGROUND

5.     In order to legally market a drug in interstate commerce, a drug's manufacturer is required to comply with all applicable provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "FDCA" or "Act") and its implementing regulations. The FDCA defines the term "drug" to include articles that: (1) are intended for use in the diagnosis, cure, treatment, or prevention of disease in an individual; or (2) are intended to affect the structure or any function of the body of man. 21 U.S.C. § 321(g)(1)(B) and (C).

6.     Among its prohibitions, the Act forbids the introduction or delivery for introduction into interstate commerce of a "misbranded" drug (e.g., a drug whose labeling fails to meet the Act's substantive requirements). 21 U.S.C. § 331(a). Under 21 U.S.C. § 333(a)(1) and the applicable case law, a corporation can be held criminally liable for a misdemeanor violation of 331(a) for causing the introduction into interstate commerce of a misbranded drug.

7.     Under the FDCA, a drug is "misbranded" if, among other things, the labeling does not bear "adequate directions for use." 21 U.S.C. § 352(f)(1). "Adequate directions for use" mean directions under which a layperson can use a drug safely and effectively for the purposes for which it is intended. 21 C.F.R. § 201.5.

8.     Under the FDCA, a "prescription drug" is (a) a drug intended for use by people that, because of its toxicity or potential for harmful effect, the method of its use, or the collateral measures necessary for its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or (b) a drug which FDA required to be administered under the professional supervision of a practitioner licensed by law to administer such drug as a condition of FDA approving the drug to be placed on the market. 21 U.S.C. §§ 353(b)(1)(A), (B).

9.     A prescription drug, by definition, cannot bear adequate directions for use by a layperson, but an FDA-approved prescription drug is exempt from the adequate-directions-for-use

requirement of 21 U.S.C. § 352(f)(1) if it, among other things, has FDA-approved labeling that provides adequate information for its safe and effective use by practitioners for all of the purposes for which it was intended, including all purposes for which it was advertised or represented. 21 C.F.R. § 201.101(c)(1), 201.100(c)(2).

10. However, an FDA-approved prescription drug that is introduced into interstate commerce for an unapproved intended use does not qualify for the regulatory exemption from the application of 21 U.S.C. § 352(f)(1), and therefore becomes misbranded. 21 C.F.R. §§ 201.5, 201.100.

11. FDA regulations define "intended use" to include the "objective intent of the persons legally responsible for the labeling" of drugs, which intent may be demonstrated by, among other things, "oral or written statements by such persons or their representatives" and the "circumstances in which the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. § 201.128.

### ENDO'S MARKETING AND PROMOTION OF OPANA ER

12. At all times relevant to this Information, including between 2006 and December 2016, ENDO marketed Opana ER, and then reformulated Opana ER, to prescribers throughout the United States, including the Eastern District of Michigan.

13. Opana ER and reformulated Opana ER were Schedule II drugs under the Controlled Substances Act. The Drug Enforcement Agency defines Schedule II drugs as those drugs "with a high potential for abuse, with use potentially leading to severe psychological or physical dependence." The labels for Opana ER and reformulated Opana ER contained "black box" warnings of serious risks from taking the opioid medication, such as addiction and respiratory depression, which can lead to death.

14. The U.S. Food and Drug Administration (FDA) first approved Opana ER in 2006

for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time. In July 2010, ENDO submitted a new drug application (NDA) to FDA for a reformulated version of Opana ER. In that NDA, ENDO asked FDA to approve a product label that stated: "[reformulated Opana ER] is formulated as a hard tablet to withstand crushing forces in excess of 800 Newtons. In standardized . . . studies, [reformulated Opana ER] demonstrated resistance to crushing, breaking, pulverization or powdering; however, the clinical significance of these properties and the impact on abuse liability has not been established."

15.     In January 2011, FDA, after receiving the clinical data submitted by ENDO, recommended that reformulated Opana ER's "product label should not include language asserting that [it] provides resistance to crushing, because it may provide a false sense of security since the product may be chewed and ground for subsequent abuse."

16.     In December 2011, FDA approved reformulated Opana ER, which ENDO called Opana ER with INTAC, which was bioequivalent to Opana ER. FDA did not, however, approve labeling for reformulated Opana ER describing crush resistance, tamper resistance, or abuse-deterrent properties, because FDA concluded that the available data was inadequate to support such labeling.

17.     In February 2012, ENDO submitted proposed promotional materials for reformulated Opana ER to FDA for advisory review. In April 2012, FDA sent ENDO a marketing claims review letter stating that claims and representations in the proposed promotion materials suggesting that reformulated Opana ER offered any therapeutic advantage over the original formulation—including claims of "mechanical stability," "mechanical strength," and "obstacle[s]" or "resistance to crushing by tools"—"ha[ve] not been demonstrated by substantial evidence or clinical experience" and "misleadingly minimize the risks associated with Opana ER by suggesting

4

that the new formulation . . . confers some form of abuse deterrence properties when this has not been demonstrated by substantial evidence." The FDA concluded:

> We are especially concerned from a public health perspective because the presence of this information in the detail aid could result in health care practitioners or patients thinking that the new formulation is safer than the old formulation, when this is not the case.

Following FDA's recommendation, ENDO removed the proposed claims identified in FDA's claims review letter and did not include them in ENDO's marketing and promotional materials for reformulated Opana ER.

18. In February 2013, ENDO submitted an NDA supplement to FDA, proposing new labeling regarding abuse deterrence for reformulated Opana ER. In May 2013, FDA denied ENDO's request for the addition of abuse deterrent language on reformulated Opana ER's label, noting that the drug could still be abused by being ground into powder or cut into small pieces, the data submitted was insufficient, and that the "ease with which the product can be manipulated . . . [is] not consistent with a formulation that would provide a reduction in oral, intranasal or intravenous abuse of OPANA ER."

19. ENDO hired hundreds of sales representatives to conduct in-person marketing of Opana ER and reformulated Opana ER (known in the industry as "detailing") of healthcare providers. ENDO's analyses showed that its detailing of healthcare providers was effective at increasing the drug's sales. ENDO focused its in-person marketing on high volume opioid prescribers, including by focusing on pain clinics, physicians' assistants, and nurse practitioners because its data showed that those providers were more likely to be receptive to marketing.

20. ENDO also incentivized its sales representatives to increase sales of Opana ER. ENDO evaluated the performance of its sales representatives, and compensated its sales representatives in part, based on the volume of prescriptions written by practitioners in their

geographic regions. It also used sales contests to motivate its sales representatives to promote Opana ER and increase sales of the drug.

## MISBRANDING OF OPANA ER

21. Despite FDA's guidance to ENDO, from April 2012 through May 2013, certain ENDO sales representatives marketed reformulated Opana ER to prescribers by touting Opana ER's purported abuse deterrence, crush resistance, and/or tamper resistance. For example:

   a. Sales Representative A marketed the drug to prescribers as "crush proof"; "difficult to crush"; "crush resistant"; and "designed to be crush resistant." Sales Representative A made these marketing statements with the understanding that "crush resistant" and "designed to be crush resistant" had the same meaning to health care providers.

   b. Sales Representative B marketed the drug's "crush resistance" to prescribers.

   c. Sales Representative C marketed the drug to prescribers as having a "tamper resistant formula."

   d. Sales Representative D marketed the drug to prescribers as "tamper resistant."

   e. Sales Representative E marketed the drug by stating that the INTAC technology made the drug harder to abuse because it was designed to be crush resistant so that it could not be snorted.

   f. Sales Representative F was trained and advised by Endo's Pain Solutions Sales team to market Opana ER as "designed to be crush resistant" even though such language was not in the FDA-approved labeling. Sales Representative F also marketed Opana ER as a safe drug with the crush resistance technology to prescribers.

6

    g. Sales Representative G marketed Opana ER to prescribers as "crush resistant," "less tampered with," and less addictive.

22. Moreover, certain ENDO sales managers were aware that certain sales representatives were making claims regarding reformulated Opana ER's purported abuse deterrence, crush resistance, and/or tamper resistance during sales calls.

23. In January 2013, ENDO supplied its sales representatives with demonstration cards that contained sample "rods" using the same INTAC technology as used in reformulated Opana ER. Some ENDO sales representatives improperly hit the demonstration rods with hammers and conducted demonstrations with sample rods to attempt to convey the message that reformulated Opana ER was, in fact, crush proof, tamper resistant, and/or abuse deterrent until May 2013. For example, Sales Representative D stated that he was given a packet that had a "tamper resistant" demonstration rod in it that he showed to doctors. Sales Representative F also stated that "there were discussions among Endo sales reps and management that some reps were hitting the INTAC packets with a hammer" or "us[ing] plyers to demonstrate that crush resistant technology with the idea being that crush resistant meant 'safer' and that the pill could not be abused." Sales Representative E stated that she was provided with demonstration rods that she could open and bang on desks in front of prescribers to demonstrate the INTAC technology.

24. ENDO continued to supply its sales representatives with demonstration rods until May 2013.

25. Prescribers who were detailed by ENDO confirmed that ENDO sales representatives marketed reformulated Opana ER as crush resistant, tamper resistant, and/or abuse deterrent:

    a. Dr. AA stated that, when detailing him, ENDO sales representatives marketed

7

reformulated Opana ER as a "safer option than the original formulation" and that they provided messaging regarding "abuse deterrence." This crush-resistant feature was important to Dr. AA in making prescribing decisions.

b. Dr. BB stated that the pharmaceutical rep for ENDO explained that reformulated Opana ER "could not be crushed with a hammer or cut with a coffee grinder." Dr. BB stated that he relied on ENDO's marketing claims as truthful, including when making prescribing decisions, because pain medications with "crush resistance" are better than those without.

c. Dr. CC stated that the ENDO sales representative told him that reformulated Opana "could not be crushed with a hammer or cut with a coffee grinder." These features were important in Dr. CC's prescribing decisions.

d. Dr. DD stated that ENDO sales representatives and speakers at pain management drug conferences marketed and touted reformulated Opana ER as "abuse deterrent." Dr. DD further stated that ENDO sales representatives indicated that Opana ER was "so hard that it cannot be crushed," and therefore it would not be abused. Dr. DD also recalled hearing from the ENDO representatives that the generic form of the drug was "not as safe."

e. Dr. EE stated that ENDO sales representatives marketed reformulated Opana ER as "abuse/crush resistant," including that the drug could not be crushed with a hammer. These marketing claims influenced his prescribing decisions.

f. Dr. FF stated that ENDO sales representatives and speakers advertised reformulated Opana ER as a "unique medicine" because it was "abuse deterrent."

26. An April 2013 survey commissioned by ENDO found that "Opana ER anti-abuse technology" was the most common piece of "unaided information heard about Opana ER within

8

the past month" by participating prescribers. In connection with that analysis, one prescriber reported the prescriber's belief that "the brand name Opana ER has the INTAC technology so it is tamper proof"; another stated that the prescriber believed that Opana ER with INTAC "is tamper resistant and the generic equivalent is not."

27. ENDO continued to market reformulated Opana ER as crush resistant, tamper resistant, and/or abuse deterrent until May 2013, when FDA specifically admonished the company that:

> Although data submitted from in vitro and in vivo studies of the properties of OPANA ER demonstrate some resistance to crushing, the product can still be ground to a fine power and cut into small pieces to compromise the extended-release characteristics when swallowed. Oxymorphone also can be easily extracted in hot water from the ground or cut tablets . . . The ease with which the product can be manipulated, and the ease with which oxymorphone can be extracted from the manipulated product, are not consistent with a formulation that would provide a reduction in oral, intranasal, or intravenous abuse of OPANA ER.

28. ENDO continued to sell reformulated Opana ER until July 2017. ENDO voluntarily withdrew the product from the market after FDA requested that ENDO do so due to concerns related to intravenous abuse of the product.

29. The FDA-approved labeling for reformulated Opana ER did not provide adequate information for healthcare providers to safely prescribe reformulated Opana ER for use as an opioid that is abuse deterrent. For example, the FDA approved labeling for reformulated Opana ER did not reflect reformulated Opana ER's purported abuse-deterrent, crush resistant, and/or tamper resistant properties that certain sales representatives conveyed to healthcare providers when marketing reformulated Opana ER (as described in paragraphs 21 and 25 above).

30. As a result of the conduct described above, ENDO is responsible for the misbranding of reformulated Opana ER by marketing the drug in a manner designed to convey abuse deterrence, but with a label that failed to include adequate directions for use for its claimed abuse deterrence, in violation of the Federal Food, Drug, and Cosmetic Act.

9

## COUNT ONE
### Introduction of Misbranded Drugs in Interstate Commerce 21 U.S.C. §§ 331(a), 333(a)(1), 352(f)(1)

31. Therefore, on dates set forth in this Information, in the Eastern District of Michigan and elsewhere, the defendant

**ENDO HEALTH SOLUTIONS INC.**

caused the introduction and delivery for introduction into interstate commerce of reformulated Opana ER, a drug within the meaning of the FDCA, 21 U.S.C. § 321(g), that was misbranded in that it was marketed in a manner designed to convey abuse deterrence, tamper resistance, and/or crush resistance, but with a label that failed to include adequate directions for use for its claimed abuse deterrence, tamper resistance, and/or crush resistance. All in violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1).

### ASSET FORFEITURE

32. Upon conviction of the Federal health care offense, as defined in 18 U.S.C. § 24, in violation of Title 21, United States Code, Section 331(a), set forth in Count One of this Information,

**ENDO HEALTH SOLUTIONS INC.**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly from gross proceeds traceable to the commission of the offense.

33. If any of the property described in Paragraph 32, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third party;

    c. Has been placed beyond the jurisdiction of the court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be divided without difficulty

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p) (as incorporated by 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(b)), to forfeiture of any other property of the defendant up to the value of the property described in Paragraph 32 above.

  All pursuant to 18 U.S.C. § 982(a)(7).

Dated: March 27, 2024

 *s/Amanda Liskamm*
Amanda Liskamm
Director
Gabriel H. Scannapieco
Assistant Director

 *s/Tara Shinnick*
Tara Shinnick
Ben Cornfeld
Trial Attorneys

Consumer Protection Branch
Civil Division
United States Department of Justice

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number |
|---|---|---|

**NOTE:** It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** |
| ☐ Yes  ☒ No | **AUSA's Initials:** TS |

**Case Title:** USA v. Endo Health Solutions Inc.

**County where offense occurred:** Wayne

**Check One:** ☐ Felony    ☒ Misdemeanor    ☐ Petty

  ____Indictment/ ✓ Information --- **no** prior complaint.
  ____Indictment/____Information --- based upon prior complaint [**Case number:**           ]
  ____Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

**Superseding Case Information**

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

March 27, 2024
Date

s/ *Tara Shinnick*
Tara Shinnick
450 5th Street, NW, Suite 6400
Washington, DC 20530
tel. 202-305-0191
Fax: 202-514-8742
E-Mail address: Tara.Shinnick@usdoj.gov
Attorney Bar #: DC # 501462

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.